# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

CHARLES R. WILLIAMS II,

                                        Plaintiff,

        v.                                                      5:22-CV-1367
                                                                (TJM/ATB)
COUNTY OF ONONDAGA, et al.,

                                        Defendants.

CHARLES R. WILLIAMS II, Plaintiff, pro se

ANDREW T. BAXTER
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court, for initial review, a pro se complaint filed on

December 19, 2022, by plaintiff Charles R. Williams II.  Plaintiff names 23 defendants,

primarily in connection with alleged civil rights violations under 42 U.S.C. § 1983.

(Dkt. No. 1) ("Compl.").[1]  Plaintiff also filed a motion for leave to proceed in forma

pauperis ("IFP").  (Dkt. No. 2).

## I.    In Forma Pauperis ("IFP") Application

Plaintiff's IFP application declares that he is unable to pay the filing fee.  (Dkt.

No. 2).  After reviewing his application, this court finds that plaintiff is financially

---

[1] Plaintiff filed an earlier action, on February 25, 2020, which was dismissed in June 2021 without prejudice for plaintiff's failure to prosecute.  (Case No. 5:20-CV-206 (TJM/ATB), Dkt. Nos. 1 (Compl.), 42 (6/10/2021 Text Order dismissing action)).  Because the complaints in this action and the earlier action make many of the same allegations relating to the time period before February 25, 2020, the cases were deemed related, leading to the direct assignment of this case to District Judge McAvoy and me.  (Case No. 5:22-CV-1367 (TJM/ATB), Dkt. No. 4 (12/27/2022 Text Order granting direct assignment)).

eligible for IFP status, although, because he is incarcerated, he will be required to submit an inmate authorization form–Form G on the Northern District of New York's public website.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974).  Although the court has a duty to show liberality toward pro se litigants, and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain

2

sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

## II.    <u>Complaint</u>

Plaintiff's complaint, dated January 10, 2022, but filed on February 25th of that year, consists of seven pages on a court form entitled "Civil Rights Complaint Pursuant to 42 U.S.C. § 1983," followed by a 23-page, 93-paragraph typed supplement ("Compl. Supp.").[2] The complaint is repetitive and somewhat difficult to follow, but the court will attempt to summarize it, leaving discussion of much of the factual detail, as necessary, in connection with my later analysis of particular issues with the complaint.[3]

Plaintiff came to the attention of the Syracuse Police Department in and around November 2019 for two reasons–(1) an apparent allegation of domestic violence and/or sexual assault by plaintiff's "common-law wife,"[4] and (2) an altercation at McNeilly's

---

[2] Because the pagination of the form complaint is not consistent, the court will reference that document with the page numbers assigned by the court's electronic docketing system, CM-ECF. The court will refer to the typed supplement to the complaint by paragraph number.

[3] The court's summary includes some allegations from the complaint in the earlier action, which provides clarity on a few issues that were not as apparent from the complaint in this action.

[4] *See* Compl. Supp., ¶ 76; Compl. in Case No. 5:20-CV-206, Dkt. No. 1 at 1. All references to complaint herein refer to the complaint in this action, unless the court specifically references the complaint in the earlier case.

Pub in Syracuse, where plaintiff allegedly worked security, which resulted in an exchange of gunfire between plaintiff and two other individuals.  Although plaintiff intertwines the facts related to these two incidents in his somewhat chronological presentation in the supplement to his complaint, the court will attempt to separate the incidents in the discussion below, in the interests of clarity.

With respect to the sexual assault allegation, the complaint indicates that plaintiff's wife's complaints led to the initiation of charges and the entry of an order of protection against plaintiff.  (Compl. Supp., ¶ 15).  Plaintiff and his wife allegedly attempted to communicate to the Syracuse Police Department and Assistant District Attorney ("ADA") Jarrett A. Woodfork that plaintiff's wife was not the victim of a sexual assault and did not want to pursue any charges against plaintiff.  (Compl. Supp., ¶ 15; Compl. in Case No. 5:20-CV-206, Dkt. No. 1 at 1, 2-3).  Nevertheless, unspecified representatives of the Syracuse Police Department "defamed" plaintiff on November 21, 2019, by "broadcasting his face on the news for crimes he did not commit."  (Compl. Supp., ¶ 2).[5]  ADA Woodfork thereafter pressured and lied to plaintiff's wife, in an effort to persuade her to accuse plaintiff, before a grand jury, of sexual assault.  Plaintiff's wife consistently refused to accuse plaintiff of sexual assault, and ultimately, no charges were pursued against the plaintiff relating to his wife. (Compl. Supp., ¶¶ 15, 21-23).

Plaintiff alleges that the November 4, 2019 incident at McNeilly's Pub began

_____

[5] As discussed below, the police had not been able to locate plaintiff by that time, so it appears that their use of the press reflected an effort to locate plaintiff so that he could be taken into custody.  The news release allegedly also stated that plaintiff shot at two men in connection with the incident at McNeilly's Pub.  (Compl., Dkt. No. 1 at 6).

when Donnell Thornton pulled a gun on plaintiff and escorted him out of the bar. Another "assailant," Arthur Stripling, then attacked plaintiff with a knife. During the encounter, a gun allegedly fell from Stripling's person, which plaintiff picked up. Thornton fired two shots at plaintiff, who then ran and jumped between two cars and exchanged gunfire with Thornton. (Compl. Supp., ¶ 1; Compl. in Case No. 5:20-CV-206, Dkt. No. 1 at 1-2). Both Thornton and Stripling were shot multiple times. (Compl. in Case No. 5:20-CV-206, Dkt. No. 1 at 2).

Plaintiff did not go to the police immediately regarding the incident at McNeilly's Pub because he was aware that they were looking for him in connection with the allegations of sexual assault by his wife. (Compl. in Case No. 5:20-CV-206, Dkt. No. 1 at 2). Plaintiff was eventually arrested, on November 25, 2019, in connection with the incident at McNeilly's Pub and, perhaps, also based on his wife's complaints of domestic abuse. (Compl. Supp., ¶¶ 3, 4). Plaintiff accused the prosecutors, inter alia, of selective prosecution relating to the McNeilly's Pub incident, by immunizing and/or giving other favorable treatment to plaintiff's two allegedly more culpable "assailants," who were used as government witnesses against him. (Compl. Supp., ¶¶ 1, 4).

The majority of plaintiff's lengthy complaint accuses one of his defense attorneys, as well as the prosecutors, judges, and witnesses involved in his prosecution relating to the McNeilly's Pub incident, of various abuses of plaintiff's constitutional rights. The prosecutors and judges were accused of insisting on excessive bail, resulting in plaintiff's pretrial detention for approximately ten months. The prosecutors

allegedly did not permit plaintiff to introduce exculpatory information before the all-white grand jury, called witnesses who committed perjury, and did not call witnesses who could provide exculpatory information.  One prosecutor, defendant ADA Anthony V. Mangovski, allegedly admitted to erasing part of crucial security video evidence from the scene of the incident, which allegedly would have proved that plaintiff was not the primary aggressor in the incident.  Several judges involved in the court proceedings allegedly excused improper delays and other pretrial procedural defaults by the prosecutors.  Plaintiff accused his first defense counsel, defendant Walter B. Coffin, Esq., of improperly trying to persuade him not to testify before the grand jury, agreeing to waive a preliminary examination against plaintiff's express wishes, and generally working to assist the ADAs in prosecuting the case against plaintiff.

Plaintiff was brought to trial in September 2022 on a five-count indictment, charging him with attempted murder 2nd, criminal use of a firearm 1st, assault 1st, criminal possession of a weapon 1st, and criminal possession of a weapon 2nd.  (Compl. Supp. ¶¶ 36, 48).  Plaintiff accused numerous civilian witnesses, including Thornton and Stripling, as well as Syracuse Police Officer Dallas Pelz, of committing perjury during trial and often contradicting prior statements that were favorable to the plaintiff.  He accused the trial prosecutor, defendant ADA Alphonse Williams, of various types of misconduct, which were allowed or facilitated by the trial judge, defendant Rory A. McMahon.  Judge McMahon allegedly allowed numerous procedural irregularities at the trial, and pressured the jury to reach a verdict on the last of five charges after it seemed apparent that the jury had acquitted plaintiff of the most serious charges.  At the

6

end of the trial, plaintiff was only convicted on the criminal possession of a weapon 2nd charge and was acquitted on the remaining charges.  (Compl. Supp., ¶ 55).[6]

Towards the end of his complaint, plaintiff alleges that his constitutional rights were violated during his confinement in the Onondaga County Justice Center.  Plaintiff claims that, in 2020 during his pretrial detention, he was exposed to Hepatitis A when "Napcare" providers and staff at the Justice Center cleared an infected inmate to work in the kitchen, which resulted in plaintiff being forced to take a vaccine against his own will or to be held in medical keep lock.  Plaintiff also alleges that, on October 30, 2020, a Napcare employee "(Jen or Erin)" violated HIPAA laws by disclosing plaintiff's medications to a custody deputy.  (Compl. Supp., ¶ 90).

After his conviction, on October 13, 2022, plaintiff alleges that certain deputies attempted to "obstruct justice" by transferring him to another facility just after he had filed a federal habeas petition.  (Compl. Supp., ¶ 75-76).[7]  When plaintiff resisted the transfer, defendants Lt. Daniel Lavy and Lt. Corey Moore summoned the emergency response team, and allegedly threatened plaintiff with violence.  (*Id*., ¶ 77).  Ultimately, plaintiff agreed to be moved to a mental health observation cell, which he alleges was infested with urine and feces, and he was not moved to a different cell until the next

---

[6] Plaintiff had apparently not been sentenced on the one count of conviction by the time his complaint was submitted.  The DOCCS Incarcerated Lookup website indicates that plaintiff was received into DOCCS custody at the Elmira Correctional Facility on 2/7/2023 in connection with a 15-year sentence for the offense of Criminal Possession of a Weapon 2nd. https://nysdoccslookup.doccs.ny.gov/

[7] There appear to be several typographical errors with respect to dates in plaintiff's complaint, including with respect to these allegations.  As noted below, plaintiff did file a habeas corpus petition in this court on October 12, 202**2**, so the alleged efforts to transfer him out of his cell appears to have occurred in October 2022, not October 2020.

day. (*Id.*, ¶¶ 78-80).[8]

The initial, handwritten portion of plaintiff's complaint suggests or asserts claims for defamation, cruel and unusual punishment, malicious prosecution, an unfair trial, and a wrong conviction. (Compl., Dkt. No. 1 at 6 ("Causes of Action")). In concluding his complaint, plaintiff claims damages of $20,000,000 and seeks expungement of charges from his criminal record based on the following alleged constitutional and other violations:

> racial discrimination, defamation of character on the news, erasure/destruction of video evidence by prosecutor/police, perjury on the stand by all witnesses at trial, perjury at the grand jury by police, wrongful arrest, wrongful conviction with no basis or element of a crime, perjury in grand jury by witnesses, extortion by complainant, prosecution bribery of witness, failure to prosecute assailants with multiple weapons, . . . forcing a deadlocked jury to render a verdict, prosecutorial misconduct, judicial misconduct, violation of my civil rights, 5th, 6th and 14th Amendment Rights to the United States Constitution.

(Compl. Supp., ¶ 91, 92).

## III.  **Judicial Immunity**

Plaintiff names as defendants two state-court judges who were involved in various court proceedings relating to his prosecution–Hon. Stephen J. Dougherty and Hon. Rory A. McMahon. Both are protected with absolute immunity from suit and from liability.

---

[8] This section of the complaint also includes plaintiff's general observation about various conditions of confinement affecting other inmates at the Justice Center in October 2022, which allegedly violated their constitutional rights. (Compl. Supp., ¶¶ 80-88). As discussed below, plaintiff does not specify any instances when he was personally harmed by these alleged conditions of confinement, does not identify any particular individuals who were personally involved in imposing such conditions of confinement on him, and does not explain how these conditions violated his constitutional rights.

### A.    Applicable Law

With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireles v. Waco*, 502 U.S. 9, 9-10 (1991).  Judicial immunity serves the public interest in having judges who are "at liberty to exercise their functions with independence and without fear of consequences." *Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2004).  Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12 (1976) (citing *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).  Judicial immunity is immunity from suit, not just immunity from the assessment of damages.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The only two circumstances in which judicial immunity does not apply is when he or she takes action "outside" his or her judicial capacity, and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12.

Injunctive relief against judges is also barred "unless a declaratory decree was violated or declaratory relief was unavailable." *Bobrowski v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 711 (S.D.N.Y. 2011) (citing inter alia *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) (per curiam)).[9]  Although fairness and injustice may result on occasion, a judicial officer must be free to act on his or her own convictions in

---

[9] Plaintiff demands in conclusory fashion that the charges against him be expunged.  As it appears likely that state collateral and appellate proceedings related to his prosecution will be ongoing, this court must abstain from granting any injunctive relief that would interfere with the ongoing criminal case. *See, e.g., Gristina v. Merchan*, No. 21-CV-8608, 2022 WL 1597732, at *2 (S.D.N.Y. May 19, 2022) ("Younger abstention provides that 'federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings'" including ongoing state criminal prosecutions) (citing, inter alia,  *Younger v. Harris*, 401 U.S. 37, 44-45 (1971)).

exercising the authority vested in him or her, "without apprehension of personal consequences. . . ." *Id.* (citing inter alia *Mireles*, 502 U.S. at 10).

Whether an act by a judge is a "judicial one" relates to the "nature of the act itself"–whether it is a function that is necessarily performed by a judge. *Id.* (citing *Stump v. Sparkman*, 436 U.S. 349, 362 (1978)). The parties must have dealt with the judge in his or her "judicial capacity." *Id.* The court acts in "absence of all jurisdiction" when "it does not have any statutory or constitutional power to adjudicate the case." *Id.* (citing *Gross v. Rell*, 585 F.3d 72, 84 (2d Cir. 2009)). The judge will not be deprived of absolute immunity if he or she takes action that is merely "in excess" of his or her authority. *Id.* (citing *Mireles*, 502 U.S. at 12-13).

## B.    Analysis

The conduct of the defendant judges about which plaintiff complains involved their actions in the courtroom in a criminal case to which they were assigned. It is clear that plaintiff's allegations against the judges who presided during his prosecution all related to the exercise of their judicial functions. Accordingly, the judges are entitled to absolute immunity and the claims against them are subject to dismissal. *See, e.g., Shtrauch v. Dowd*, 651 F. App'x 72, 73-74 (2d Cir. 2016) (*"*Generally, 'acts arising out of, or related to, individual cases before the judge are considered judicial in nature'") (quoting *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009)); *Kim v. Saccento*, No. 21-2865, 2022 WL 9583756, at *2 (2d Cir. Oct. 17, 2022) ("the actions that [plaintiff] complains of – adverse decisions in a criminal proceeding – are plainly judicial in nature"); *Root v. Liston*, 444 F.3d 127, 132 (2d Cir. 2006) (judges who set bail enjoy

absolute immunity) (collecting cases).

## IV.    __Prosecutorial Immunity__

Plaintiff asserts claims against ADA Jarrett Woodfork, who was involved in the grand jury investigation of plaintiff regarding the allegations of sexual assault, as well as ADAs Michael Whalen, Anthony Mangovski, and Alphonse Williams, who were involved in various aspects of the prosecution of plaintiff relating to the incident at McNeilly's Pub.  Based on plaintiff's allegations, these defendants are protected by absolute prosecutorial immunity.

### A.    **Applicable Law**[10]

Prosecutors enjoy "absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987).  The immunity covers "virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995).  Functions to which absolute immunity applies are when a prosecutor's conduct, acting as an advocate during the judicial phase of the criminal process, involves the exercise of discretion.  *See Flagler v. Trainor*, 663 F.3d 543, 547 (2d Cir. 2011) ("Prosecutors are absolutely immune from suit only when acting as advocates and when their conduct involves the exercise of discretion.") (citing *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997)).  This includes such functions as "deciding whether to bring charges and

---

[10] This discussion of the applicable law is based on Senior District Judge McAvoy's cogent summary in *Brown v. Fallon*, No. 1:21-CV-641 (TJM/ML), 2022 WL 4103998, at *5 (N.D.N.Y. Sept. 8, 2022), which in turn quotes extensively from *Anilao v. Spota*, 27 F.4th 855, 863-64 (2d Cir. 2022)

presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection, and issuing subpoenas," *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013), and whether and when to drop charges. *Taylor*, 640 F.2d at 452. "This immunity attaches to conduct in court, as well as conduct 'preliminary to the initiation of a prosecution and actions apart from the courtroom.'" *Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (quoting *Imbler*, 424 U.S. at 431 n. 33).

"[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused." *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 199-200 (1985)). Absolute immunity extends even to a prosecutor who "conspir[es] to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (cleaned up). Immunity even extends to "the falsification of evidence and the coercion of witnesses," *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981), "the knowing use of perjured testimony," "the deliberate withholding of exculpatory information," *Imbler v. Pachtman*, 424 U.S. 409, 431 n.34 (1976), the "making [of] false or defamatory statements in judicial proceedings," *Burns v. Reed*, 500 U.S. 478, 490 (1991) (collecting cases), and "conspiring to present false evidence at a criminal trial," *Dory*, 25 F.3d at 83.

12

### B.    Analysis

Plaintiff contends that ADA Woodfork, in pursuing charges based on his wife's apparent complaint of domestic violence and/or sexual assault, lied to her and pressured her to falsely accuse plaintiff in the grand jury.  Based on the authority discussed above, ADA Woodfork's efforts to pursue the charges against plaintiff and prepare witnesses for testimony before the grand jury would fall within his prosecutorial functions and would be protected by absolute immunity, regardless of whether the prosecutor engaged in the type of misconduct alleged.  *See, e.g.*, *Brown v. Fallon*, 2022 WL 4103998, at *8 ("the courts have long held that a prosecutor's determination to bring charges against an individual by the presentment of a case to a grand jury, even if it involves the presentation of false or fabricated evidence, is an act by an advocate intimately related to the judicial phase of the criminal process to which absolute prosecutorial immunity applies) (citing, inter alia, *Simon*, 727 F.3d at 171 (absolute immunity applies to such functions as "deciding whether to bring charges and presenting a case to a grand jury or a court, **along with the tasks generally considered adjunct to those functions, such as witness preparation, witness selection**, and issuing subpoenas") (emphasis added)).

The plaintiff's allegations against the ADAs who were involved in his prosecution relating to the incident at McNeilly's Pub were clearly carrying out prosecutorial functions in court in a case to which they were assigned.  Based on the authority cited above, these prosecutors are immune from suit and liability based on absolute prosecutorial immunity.  As noted above, to the extent the prosecutors decided not to charge plaintiff's alleged "assailants" in the McNeilly's Pub incident, and/or to

immunize them or use them as witnesses against plaintiff, they would also be protected by absolute immunity, regardless of their motivation. *See, e.g., Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 505 (2d Cir. 2004) ("regardless of defendants' . . . motives, absolute immunity shields them from suit pursuant to § 1983 for their alleged malicious or selective prosecution of plaintiffs, as well as for any misconduct in the presentation of evidence to the grand juries that returned the challenged indictments against plaintiffs"); *Corley v. Vance*, 365 F. Supp. 3d 407, 457-58 & n.21 (S.D.N.Y. 2019) ("Plaintiff's selective prosecution claim, even if not barred by *Heck* [*v. Humphrey*], additionally fails because prosecutorial immunity shields the DA Defendants."), *aff'd*, 811 F. App'x 62 (2d Cir. 2020).[11]

## V.    **Witness Immunity**

Plaintiff's civil rights claims against Syracuse Police Officer Dallas Pelz, and civilians Arthur Stripling, Tonya Burton, Tammy McNeilly, and Sasha Thornton, are based on the allegation that they testified falsely and/or to plaintiff's detriment in the grand jury and/or at trial. (Compl. Supp., ¶¶ 44, 46, 64-67). However, "witnesses, including police officers, who testify in judicial proceedings[,] . . . 'are integral parts of the judicial process' and, accordingly, are shielded by absolute immunity." *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (citations omitted); *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983). The Supreme Court has established that grand jury witnesses should

---

[11] Plaintiff makes a conclusory allegation that his selective prosecution was motivated by his race. *Corley* held that a Section 1983 claims against a prosecutor based on vindictive or selective prosecution based on race would still be barred by absolute prosecutorial immunity. *Corley v. Vance*, 365 F. Supp. 3d at 461. The application, to plaintiff's claims, of *Heck v. Humphrey*, 512 U.S. 477 (1994), is discussed further below.

enjoy the same absolute immunity from any § 1983 claim as witnesses at trial. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). "[T]his rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. *Id.*  Accordingly, the claims against these grand jury and trial witnesses are subject to dismissal.[12]

## VI.    State Action

### A.    Applicable Law

A claim for relief under 42 U.S.C. § 1983 must allege facts showing that the defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983.  Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *See West v. Atkins*, 487 U.S. 42, 48-49 (1988).  While private individuals are not state actors, such individuals can be liable under Section 1983 if they acted either "jointly" or "in conspiracy" with a state actor to deprive the plaintiff of a constitutional right.[13]  *Stewart v. Victoria's Secret Stores*, LLC, 851 F. Supp. 2d 442,

---

[12] As discussed below, any civil rights claims against the civilian defendants would also be subject to dismissal for lack of "state action" and plaintiff may not predicate civil rights violations on criminal statutes such as those outlawing perjury.

[13] "The elements of a § 1983 conspiracy claim for deprivation of civil rights include, (1) an agreement between two or more state actors, or a state actor and a private entity, (2) to act in concert to inflict constitutional injury, [and] (3) an overt act done in furtherance of the goal of causing damages." *McCray v. City of New York*, No. 03-CV-1008, 2007 WL 4352748, at *23 (S.D.N.Y. Dec. 11, 2007) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).

445 (E.D.N.Y. 2012); *see also Betts v. Shearman*, 751 F.3d 78, 84 n.1 (2d Cir. 2014).

However, "[a] merely conclusory allegation that a private entity acted in concert with a

state actor does not suffice to state a § 1983 claim against the private entity."

*Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).

### B.    Analysis

#### 1.    Attorney Coffin

Walter B. Coffin was plaintiff's first "assigned" lawyer in his criminal case, who

was ultimately replaced by another attorney.  (Compl. Supp., ¶ 7).  "[I]t is axiomatic

that a "public defender does not act under color of state law when performing a

lawyer's traditional functions as counsel to a defendant in a criminal proceeding."

*Flores v. Levy*, No. 07-CV-3753, 2008 WL 4394681, at *7 (E.D.N.Y. Sept. 23, 2008)

(citing, inter alia, *Rodriguez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997) ("it is

well-established that court-appointed attorneys performing a lawyer's traditional

functions as counsel to defendant do not act 'under color of state law' and therefore are

not subject to suit under 42 U.S.C. § 1983"); *Benjamin v. Branden*, No. 21-CV-4927,

2022 WL 1092681, at *2 (E.D.N.Y. Apr. 12, 2022) (collecting cases).  "Section 1983

'was enacted to redress civil rights violations by persons acting under color of State

law' and should not be used by clients disappointed with the performance of their

attorneys."  *Brooks v. New York State Supreme Court*, No. 02-CV-4183, 2002 WL

31528632, at *3 (E.D.N.Y. Aug.16, 2002) (citation omitted)).

While plaintiff criticized Attorney Coffin's advice in several respects and alleges

that his lawyer counsel made tactical decisions contrary to plaintiff's wishes and

direction, that would not alter the fact that plaintiff's defense counsel was not a state actor.  Plaintiff also noted that, when Attorney Coffin was advised by "a complainant" (apparently plaintiff's wife) that she was not sexually assaulted by plaintiff, he referred the complainant to ADA Woodcock to provide a corrected statement to the authorities. (Compl. Supp., ¶ 14).  Plaintiff alleged that Attorney Coffin was conspiring with the prosecutors, essentially to deny plaintiff a fair trial:

> Permission to speak freely? I feel and know upon information and believe [sic] that Mr. Coffin is on the take and working for the Onondaga County District Attorney's Office. He is given all of the high-profile cases where the defendants may or may not be guilty and his job is to get them to plead guilty and waive certain rights and in return, he is assigned the most (high-profile) cases and I can prove it!  Let me proceed.

(Compl. Supp., ¶ 12).  These allegations are speculative and conclusory, and are not sufficient to establish a conspiracy that would qualify Attorney Coffin as a state actor. *See, e.g., Flores v. Levy*, No. 07-CV-3753, 2008 WL 4394681, at *10 (E.D.N.Y. Sept. 23, 2008) (allegations that Legal Aid attorneys engaged in numerous conspiracies with the other defendants "(1) denying plaintiff his right to counsel; (2) preventing plaintiff from testifying before the grand jury; (3) allowing the defendant prosecutors to "lift" the indictment into the county court; and (4) adding the additional charge of assault in the first degree to the indictment" do not support a plausible claim of conspiracy with the other defendants) (collecting cases).  "Moreover, as the Second Circuit has noted, generalized allegations of conspiracy 'ring especially hollow' where, as here, the parties alleged to be part of the same conspiracy have an adversarial relationship." *Id*. (citing *Ciambriello*, 292 F.3d at 324).

In any event, plaintiff suggests only a conspiracy between Attorney Coffin and

the ADAs involved in the prosecution of plaintiff, all of whom are protected by absolute immunity.  Where plaintiff's only conspirators are protected by absolute immunity, "Plaintiff's defense attorney[] therefore had no state actor with whom [he] could have conspired, rend[er]ing Plaintiff's conspiracy claim deficient as a matter of law."  *Murdock v. Legal Aid Soc'y*, No. 14-CV-0508, 2015 WL 94245, at *3 (E.D.N.Y. Jan. 6, 2015) (citing, inter alia, *Delarosa v. Serita*, No. 14-CV-737, 2014 WL 1672557, at *4 (E.D.N.Y. Apr. 28, 2014) (dismissing Section 1983 conspiracy claim because the assistant district attorney was immune from suit and the criminal defense attorney therefore had no "state actors with whom [he] could have conspired to deprive Plaintiff of his Constitutional rights").

### 2.    Other Alleged Conspirators

Plaintiff may have intended to suggest that other civilians, such as the witnesses who allegedly committed perjury at trial, also conspired with state actors to infringe on plaintiff's constitutional rights, and should be liable under Section 1983.  (Compl. Supp., ¶¶ 64-67).  However, the complaint makes no explicit allegations of conspiracy involving these witnesses and an allegation that they committed perjury is clearly not sufficient to make them state actors.  *See Flores v. Levy*, 2008 WL 4394681, at *9 (the mere allegation a civilian witness committed perjury, and the prosecutor's alleged failure to correct such testimony, is insufficient to support a conspiracy claim making the witness a state actor) (collecting cases).  In any event, as discussed above, because plaintiff's allegations focus on the civilian witnesses's testimony at trial or grand jury, they are, like the prosecutors who likely helped prepare the witness testimony,

protected by absolute immunity and cannot be state actors.

## VII.  **Claims Based on Criminal Violations**

Plaintiff's claims appear to be based, in part, on the defendants' alleged violations of federal or state criminal statutes such as state statutes outlawing perjury, evidence or witness tampering, extortion, and bribery.  However, plaintiff may not assert claims under Section 1983 based on criminal violations.  *See, e.g., Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 348 n.19 (S.D.N.Y. 2014) (allegations that defendants violated criminal statutes by submitting false statements and falsified documents, or committing perjury "cannot form the basis of a . . . § 1983 or related claim given that those statutes apply only to violations of federal constitutional rights") (collecting cases); *Patterson v. Patterson*, No. 1:16-CV-844, 2019 WL 1284346, at *7 (W.D.N.Y. Mar. 20, 2019) ("Courts within this Circuit have accordingly held consistently that criminal charges . . . 'cannot be prosecuted by a private person.'") (collecting cases).

## VIII.  **Malicious Prosecution/Heck v. Humphrey**

Many of plaintiff's claims against particular defendants are subject to dismissal on multiple grounds, including absolute immunity.  Although not necessary to support dismissal of any defendant, the court will discuss alternative bases for dismissal of plaintiff's malicious prosecution and related claims.[14]

Because plaintiff is a pro se litigant, the court must "read his supporting papers

---

[14] Plaintiff's Third Cause of Action in the handwritten portion of his complaint referenced malicious prosecution and denial of a fair trial.  (Compl., Dkt. No. 1 at 6).  Towards the end of the supplement to his complaint, plaintiff also invoked "wrongful arrest."  (Compl. Supp., ¶ 91).

liberally, and . . . interpret them to raise the strongest arguments that they suggest."
*Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Plaintiff's allegations that the
defendants conspired to fabricate evidence against him, withhold exculpatory evidence,
and otherwise deny him a fair trial most strongly suggest claims for malicious
prosecution, denial of due process and a fair trial, and a claim for failure to disclose
exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1983).[15]

### A.    Applicable Law

#### 1.    Malicious Prosecution

"The elements of a malicious prosecution claim under section 1983 are derived
from applicable state law." *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013)
(citation omitted). "We have stated these elements, under New York law, to be (1)
commencement of a criminal proceeding, (2) favorable termination of the proceeding,

---

[15] To the extent plaintiff suggests a false arrest claim, such a claim is defeated if probable
cause supports the arrest on some charge. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)
(collecting cases). If, following the arrest, the plaintiff was convicted of the charges against him,
that conviction normally "would be conclusive evidence of probable cause." *Id.* (citation
omitted). Given that plaintiff's conviction on at least one offense has not been invalidated, he
cannot state a viable claims for false arrest on the current record. *Cf. Hayes v. County of
Sullivan*, 853 F. Supp. 2d 400, 428 (S.D.N.Y. 2012) ("When a [§] 1983 plaintiff pleads guilty to
the underlying or lesser included charge, this fact alone provides sufficient evidence that
probable cause existed at the time of the arrest and precludes a false arrest claim under [§]
1983.") Moreover, a claim for false arrest can only be based on police conduct before the
defendant is subject to arrest or other judicial process. *Wallace v. Kato*, 549 U.S. 384, 388-90
(2007) (a claim for false arrest or imprisonment "ends once the victim becomes held pursuant to .
. . process–when, for example, he is bound over by a magistrate or arraigned on charges. . . .
Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of
malicious prosecution"). Because most of plaintiff's allegations of misconduct by the defendants
occurred after the start of formal criminal proceedings, malicious prosecution and due
process/fair trial claims, not false arrest claims, are his most tenable causes of action.

(3) lack of probable cause,[16] and (4) institution of the proceedings with actual malice. *Id*. at 111-12.  Based on a recent decision of the Supreme Court, "[a] plaintiff need only show that the criminal prosecution ended without a conviction," to satisfy the favorable termination element. *Thompson v. Clark*, __ U.S. __, 142 S. Ct. 1332, 1341 (2022).

"Where a criminal prosecution concluded in acquittal on some but not all charges, the court must determine whether the charges are 'sufficiently distinct to allow a malicious prosecution claim to proceed on the charge for which there was an acquittal.'" *Jones v. City of New York*, No. 19-CV-9126, 2020 WL 1503509, at *4 (S.D.N.Y. Mar. 27, 2020) (quoting *Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989)) , *aff'd*, 846 F. App'x 22 (2d Cir. 2021).  "Courts examine several factors in determining whether charges are sufficiently distinct: (1) disparity in sentencing ranges; (2) the elements of each crime; and (3) whether the crimes were related or separate acts." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 447-48 (E.D.N.Y. 2015) (citation omitted).  "Courts in this Circuit frequently apply *Janetka* where a plaintiff, charged with multiple []counts, is acquitted on counts that arise from a distinct set of factual allegations from the counts for which he was convicted."  *Dunham v. City of New York*, 295 F. Supp. 3d 319, 333-35 (S.D.N.Y. 2018) (citing, inter alia, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 337 (E.D.N.Y. 2006) (*Janetka* requires a court to look at "whether the elements of each charge are different, whether one charge is a lesser included offense of the other, and whether the alleged convictions were directed at

---

[16] While an indictment may ordinarily be conclusive evidence of probable cause, that presumption may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith. *See Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010).

different people").

### 2. Due Process/Fair Trial Claim

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citations omitted). To succeed on a Section 1983 claim alleging a fair trial violation, a plaintiff must prove that "an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Ross v. City of New York*, No. 17-CV-3505, 2019 WL 4805147, at *5 (E.D.N.Y. Sept. 30, 2019) (*quoting Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

"Whether the proceeding was terminated in a manner indicative of innocence . . . is not dispositive in the context of a section 1983 fair-trial claim." *Smalls v. Collins*, 10 F.4th 117, 138-39 (2d Cir. 2021). "Where the plaintiff asserts a section 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Id*. at 139 (citing *McDonough v. Smith*, __ U.S. __, 139 S. Ct. 2149, 2158 (2019)).

### 3.    *Brady* Violation

To the extent the plaintiff alleges defendants withheld or destroyed exculpatory evidence in connection with grand jury or trial, he suggests a claim under the Supreme Court's seminal case of *Brady v. Maryland*, 373 U.S. 83 (1983).  "'There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (citations omitted).

### 4.    *Heck v. Humphrey*

Civil lawsuits may not be used to collaterally attack criminal convictions.  *Heck v. Humphrey*, 512 U.S. 477 (1994).  In *Heck*, the Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."  *Id*. at 486-87.

A claim is barred by *Heck* if it directly attacks the propriety of the criminal action and is inconsistent with a state court criminal conviction, unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  *Bowers v. Kelly*, No. 13 Civ. 06265, 2015 WL 2061582, at *3-4 (S.D.N.Y. May 4, 2015).  This aspect of the *Heck* analysis standard parallels the favorable termination standard for

malicious prosecution claims. *See id.; Poventud v. City of New York*, 750 F.3d 121, 130 (2d Cir. 2014) (the Supreme Court in *Heck* the Court applied "'the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . . to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution'") (citations omitted).

The standard for applying *Heck* when a civil right plaintiff has been convicted of some criminal charges and acquitted of others is also similar to the standard for a malicious prosecution claim. "Where plaintiff's allegations attempt to undermine the legality of his or her entire prosecution, such that a challenge is to both the counts for which plaintiff was acquitted and for which he or she was convicted, a lawsuit will be barred by *Heck*." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (collecting cases).

### B.    Analysis

All of the criminal charges in the indictment against plaintiff related to the same confrontation between plaintiff and two other individuals during the McNeilly's Pub incident. While the charges, all felonies, carried different penalties and had different elements, plaintiff's possession of a weapon was a circumstance common to both the charges on which he was acquitted and the weapons possession charge on which he was convicted. Plaintiff acknowledges his conviction on the charge of Criminal Possession of a Weapon in the Second Degree–a class C felony under N.Y. Penal Law § 265.03 which criminalizes possession of a "loaded firearm" "with intent to use the same

unlawfully against another."  The same conduct would relate to the other charges

brought against plaintiff as a result of his exchange of gunfire with and wounding of

two other individuals–attempted murder, assault, and criminal use of a weapon.  Under

the reasoning of cases such as *Goree v. Gunning*, 738 F. Supp. 79, 82-83 (E.D.N.Y.

1990), the plaintiff's conviction on the weapons possession charges precludes him from

asserting a favorable termination necessary to support a malicious prosecution claim on

the acquitted charges, even though the offenses have different elements and carry

different penalties:

> The resisting arrest, criminal possession of a weapon and menacing charges all
> arose from Goree's actions directed at [police officer] Tully during the course of
> Tully's attempts to arrest him, and the harassment and disorderly conduct charges
> arose from Goree's alleged use of abusive and obscene language and obscene
> gestures toward Tully immediately prior to the arrest.  Moreover, although the
> criminal possession of a weapon in the fourth degree and menacing charges are
> separate offenses with elements different from the other charges, the allegations
> forming the bases of these charges and the resisting arrest charge are not distinct.
> Thus, the present case is distinguishable from *Janetka* and *Cuthrell* in that in
> both of those cases distinct allegations formed the bases of the different charges
> involved.  Here, the same conduct which formed the bases for the criminal
> possession and menacing charges also formed the basis for the resisting arrest
> charge.  In addition, Goree was convicted of the resisting arrest charge, one of
> the two class A misdemeanor charges.

*Id*.

Similar analysis supports the conclusion that plaintiff's imputed due process/fair

trial claim would "impugn" his apparently ongoing criminal case and his outstanding

weapons possession conviction, which would compel dismissal of that claim.

Moreover, plaintiff's due process/fair trial, malicious prosecution, and *Brady* claims

would all attack the propriety of the prosecution of plaintiff on all the charges against

25

him, including the weapons possession charge on which he was convicted. Thus, those claims would be barred by *Heck v. Humprhey* unless and until that conviction was invalidated. *See, e.g.*, *Bowers v. Kelly*, 2015 WL 2061582, at *3-4 ("Plaintiff's malicious prosecution, *Brady*, fair trial and conspiracy claims all directly attack the propriety of the criminal action against Plaintiff. As they are inconsistent with his state court criminal conviction, they must be dismissed [pursuant to Heck].")[17] *See also Amaker v. Weiner*, 179 F.3d 48, 51-52 (2d Cir. 1999) (applying Heck to claims under 28 U.S.C. §§ 1981, 1985 and 1986 that "asserted existence of a conspiracy to frame plaintiff" because they "plainly would call into question the validity of his conviction").

## IX.   **Conditions of Confinement**

As noted above, plaintiff has complained of "cruel and unusual punishment" during his confinement by Onondaga County, alleging some specific incidents involving him, as well as a number of other general observations about conditions and practices in the county jails. Because the conditions of confinement challenged by plaintiff all occurred before he was sentenced, these claims must be addressed under the Fourteenth Amendment Due Process Clause, not the Eighth Amendment cruel and unusual punishment provisions. *See, e.g., Williams v. Savory*, 87 F. Supp. 3d 437, 452 (S.D.N.Y. 2015) ("the Eighth Amendment does not attach until after conviction and sentencing, as 'it was designed to protect those convicted of crimes'") (citing, inter alia,

---

[17] *Bowers* also noted: "The dismissal is without prejudice, but the claims may be reasserted only if the state court conviction is overturned, as the Supreme Court described in *Heck*." *Id*.

26

*Ingraham v. Wright*, 430 U.S. 651, 664 (1977)).[18]

## A.    Applicable Law

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). "This means that a pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'– perhaps better classified as a 'mens rea prong' or 'mental element prong'–showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id*. "Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.'" *Id*. at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).

"[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or

---

[18] To pursue Section 1983 claims regarding the conditions of his confinement, plaintiff was first obligated to exhaust available administrative remedies at the facility where he was incarcerated. *See, e.g., Rodriguez v. Heit*, No. 9:16-CV-706 (GTS/ATB), 2018 WL 3121626, at *2-4 (N.D.N.Y. Mar. 30, 2018), *report and recommendation adopted*, 2018 WL 2316687 (N.D.N.Y. May 22, 2018). However, failure to exhaust administrative remedies is an affirmative defense. Thus, unless it is unmistakably clear from the face of the complaint that administrative remedies were available and had not been exhausted, "it is bad practice for a district court to dismiss without affording a plaintiff the opportunity to be heard in opposition." *See, e.g., Carolina v. Feder*, No. 3:20-CV-658, 2021 WL 268854, at *10 (D. Conn. Jan. 26, 2021), *reconsideration denied*, 2021 WL 723534 (D. Conn. Feb. 24, 2021).

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.  In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." Id. at 35.

## B.   Analysis

### 1.   Alleged Exposure to Hepatitis A

Plaintiff alleges, that in or about early 2020, while confined in the Onondaga County Justice Center:

> I was subjected to Hepatitis A, when Nap[hC]are[19] providers and Onondaga County Justice Center employees cleared an inmate to work in the inmate kitchen.  This inmate tested positive for the virus before he was cleared to work in the meal preparation room.  Due to the gross negligence of both county employees and employers, I was placed at risk to contract this non-curable disease I was forced to take a vaccine against my own will or be locked in (medical keep-lock) until I would allow them to put this disease in my body in a form of a vaccine.

(Compl. Supp., ¶ 89).  Notably, the plaintiff does not state that he ever contracted

---

[19] Based on other litigation in this District, the court is aware that a company named NaphCare, Inc. was a contractor who, for a time, provided medical care to inmates in Onondaga County corrections facilities.  (N.D.N.Y. Case No. 5:22-CV-1165 (BKS/TWD), Compl., ¶ 15, Dkt. No. 1 at 4).  The court will assume, without deciding, that NaphCare and its employees are state actors for the purposes of claims under Section 1983.  *See Caballero v. Shayna*, No. 18-CV-1627, 2019 WL 2491717, at *3 (E.D.N.Y. June 14, 2019) (for the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test').")  (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008).

Hepatitis A, he does not identify any individual defendants who were personally responsible for allegedly exposing him to Hepatitis A,[20] he does not reference any policy of the Justice Center or NaphCare that allegedly required him to choose between a Hepatitis A vaccination or medical isolation of some unspecified duration,[21] nor does he allege that he opposed being vaccinated on the basis of his religious beliefs or for any other constitutionally protected reason.

To the extent NaphCare, Onondaga County, or their employees acted with gross negligence in exposing prisoners at the Justice Center to Hepatitis A, as plaintiff alleges, that would not support a due process claim for deliberate indifference to unsafe conditions of pretrial confinement. *See Darnell v. Pineiro*, 849 F.3d at 36 ("[A]ny § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence. . . . A detainee must prove that an official acted intentionally or recklessly, and not merely negligently.") (citations omitted). In any event, under section 1997e(e) of the Prison Litigation Reform Act ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Gilmore v. Rivera*, No. 13 CIV. 6955, 2014 WL 1998227, at *6 (S.D.N.Y. May 14, 2014) (quoting 42 U.S.C. § 1997e(e)). At most, plaintiff experienced

---

[20] It has long been established that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted).

[21] As discussed further below, in order to establish liability of a municipality pursuant to 42 U.S.C. § 1983 for violation of civil or constitutional rights, a plaintiff must allege that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Monell v. Dep't of Social Services*, 436 U.S. 658, 691-94 (1978).

"apprehension of the contraction of . . . Hepatitis A" which would constitute an

"emotional injur[y]" that would not support a Section 1983 claim for damages. *Id*. at 7.

Similarly, any anxiety plaintiff suffered as a result of being vaccinated for Hepatitis A,

in the absence of any resulting physical harm, would not support such a claim.

### 2.    Alleged Disclosure of Plaintiff's Medications

Plaintiff alleges that:

> On October 30, 2020, at the Onondaga County Justice Center Facility, an LPN
> (Jen or Erin) who works for an Nap[hC]are providers broke HIPAA laws[22] when
> I heard her tell Deputy Schmunk what medication I was receiving. She gave him
> a rundown out of my pill containers, "ibuprofen, Seroquel, BuSpar" and she only
> stopped once she realized I was at my cell door, watching her . . . .

(Compl. Supp., ¶ 90).  However, "[c]ourts have overwhelmingly concluded that there is

no private right of action under HIPAA." *Coon v. Burkly*, No. 1:13-CV-1306, 2014

WL 1976669, at *8 (N.D.N.Y. May 15, 2014) (collecting cases)).  Enforcement of

HIPAA is reserved exclusively to the Secretary of Heath and Human Services. *Rzayeva

v. United States*, 492 F. Supp. 2d 60, 83 (D. Conn. 2007).

The Second Circuit has recognized a constitutional right, protected by the First

Amendment, to "'maintain the confidentiality of previously undisclosed medical

information.'" *Mendez v. Quiros*, No. 3:16-CV-2097, 2017 WL 374462, at *3 (D.

Conn. Jan. 25, 2017) (quoting *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999)).

Prison officials may only "disclose medical information to the extent that disclosure

relates to a 'legitimate penological interest.'" *Id.*  "'The gratuitous disclosure of an

---

[22] "HIPAA" is the commonly-used acronym for the Health Insurance Portability and
Accountability Act, 42 U.S.C. § 1320 et seq., which requires health care providers to keep patient
medical records confidential.

inmate's confidential medical information as humor or gossip . . . is not reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy.'" *Id.*

The degree of protection afforded to an inmate's medical condition varies with the "sensitive" nature of the condition. *Id.* (citing *Powell*, 175 F.3d at 111). In order to state a claim for violation of the right to keep medical information confidential, the plaintiff must show that he suffers from an "unusual or sensitive medical condition that, if disclosed, would expose him to ridicule, discrimination or even violence, particularly when the word of the condition is likely to spread through 'humor or gossip[.]'" *Id.* (quoting *Powell*, 175 F.3d at 112).

Plaintiff alleges that a female employee of NaphCare, not identified by full name, began to list plaintiff's medications to a correction office, two of which–Seroquel, BuSpar–are often prescribed to address mental health issues. In *Hunnicutt v. Armstrong*, a panel of the Second Circuit held that a defendant violated the plaintiff's constitutional privacy by discussing plaintiff's "private/personal mental health issues . . . in front of other prisoners and D.O.C. employees[.]" 152 F. App'x 34, 35-36 (2d Cir. 2005). Hunnicutt is readily distinguishable from this case, where the only medical information disclosed, to one correction officer, was the name of plaintiff's medications, two of which might or might not be identified as mental health medications by non-medical personnel. *See, e.g., Brooks v. Hogan*, No. 9:14-CV-477 (LEK/DJS), 2016 WL 1298137, at *3 (N.D.N.Y. Mar. 31, 2016) (inmate does not have a confidentiality interest in a list of his prescription medications).

Moreover, as one District Court subsequently noted:

*Hunnicutt* is an unpublished summary order from 2005 and therefore, while persuasive, has no precedential effect under Rule 32.1.1(a) of the Local Rules of the Second Circuit. . . . Indeed, the summary order does not provide any analysis on this point.

    Notably, other courts since *Hunnicutt* have concluded that an inmate's mental impairment was not so "unusual" that the disclosure of information pertaining to such condition rose to a Fourteenth Amendment violation. . . . Although bipolar disorder is a serious medical condition, it does not appear, in the prison context, to carry 'a social stigma equivalent to HIV/AIDS or transsexualism' . . . ., nor is such disclosure likely to expose an inmate 'to discrimination or intolerance.' . . .

*Dash v. Mayers*, No. 19-CV-414, 2020 WL 1946303, at *4-5 (S.D.N.Y. Apr. 23, 2020) (collecting cases), *report and recommendation adopted*, 2020 WL 3057133, at *3 (S.D.N.Y. June 9, 2020) (collecting cases).[23]  Indeed, plaintiff's complaint implicitly recognizes that the disclosure of his mental health medications to the correction officer was not the type of sensitive information that would subject him to stigma or harm.

What if I was taking HIV or A.I.D.S. medication.  It would have been spread all through the facility.  Her actions violated HIPAA Laws, facility protocol, and . . . place the plaintiff's life in danger by doing so.

(Compl. Supp., ¶ 90).  Accordingly, this court concludes that the alleged disclosure of plaintiff's medications to one correction officer did not violate any constitutional or

---

[23] The numerous cases cited in the *Dash* opinions establish that the majority rule among district courts in this Circuit is that disclosure of mental health information does not violate a prisoner's privacy rights.  *See also, Flores v. City of New York*, No. 21-CV-1680, 2022 WL 4705949, at *22 (S.D.N.Y. Aug. 8, 2022), *report and recommendation adopted*, 2022 WL 4592892 (S.D.N.Y. Sept. 30, 2022) ("Courts within the Second Circuit have declined to recognize a claim for violation of medical privacy with regard to disclosure of mental health disorders because such disclosure was not likely to expose an inmate to discrimination or intolerance.") (collecting cases).  *Cf. Medina v. Watson*, No. 3:16-CV-2061, 2017 WL 62512, at *2 (D. Conn. Jan. 5, 2017) (following *Hunnicutt*).

federal statutory right of plaintiff.

### 3.    Conditions in Observation Cell

Plaintiff acknowledges that, after his trial was completed in October 2022, but before he was sentenced, he vociferously resisted the efforts of correction officers to move him to a different facility, apparently because he felt that would impede him in pursuing the habeas petition he had just filed with the federal court.  (Compl. Supp., ¶¶ 75-77).[24]  Plaintiff alleges that defendants Moore and Lavy threatened to call the Sheriff Emergency Response Team to force him to leave his cell and otherwise threatened him with violence.  (*Id.*, ¶¶ 76-77).[25]  Plaintiff then "agreed to be walked upstairs to the mental health unit. . . ."  (*Id.*, ¶¶ 78).  Plaintiff further alleges:

> [U]pon my arrival to the mental health unit, I was placed in a hang proof cell and stripped of my clothes and dignity in front of everyone.  I was placed in a cell that had feces and urine all over the floor and walls from the last mentally ill inmate.  It was so bad that while I am naked, surrounded by deputies I told Lt.

---

[24] That habeas petition was dismissed sua sponte on October 26, 2022, shortly after it was filed on October 12th, because plaintiff had not been sentenced and had not exhausted his state court remedies, as required before he could pursue any federal habeas petition.  (N.D.N.Y. Case No. 9:22-CV-1054 (GLS), Dkt. Nos. 1, 4, 5).  The docket reflects that plaintiff was able to correspond with the court between October 12th and October 26th and that nothing served by the court on the plaintiff was returned as undeliverable.  (*Id.*, Dkt. Nos. 2, 3).  Hence, there is no basis for plaintiff to contend that the alleged efforts of Onondaga County correction officials to transfer him interfered with his access to courts or obstructed his ability to pursue his habeas petition.  *See, e.g., Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) ("To state a valid § 1983 claim that he has been denied reasonable access to the courts, [plaintiff] must show that the alleged deprivation actually interfered with his access to the courts or prejudiced an existing action.")  Plaintiff filed a prior habeas petition in June 2020 that was also dismissed in September 2021 as premature for failure to exhaust state remedies.  (N.D.N.Y. Case No. 9:20-CV-660 (LEK), Dkt. Nos. 1, 13, 14).

[25] "Because Plaintiff alleges nothing beyond mere threats of force, [any] excessive force claim [would] fail[]."  *Pelt v. City of New York*, No. 11-CV-5633, 2013 WL 4647500, at *13 (E.D.N.Y. Aug. 28, 2013) ("[T]hreat[s] of force . . . do [ ] not support an excessive force claim.") (collecting cases).

> Moore to come here and he came in the cell and told them "Oh yeah, we have to clean this." This is after I had been standing in this urine, with feces everywhere. An inmate came and mopped the floor and I was sent back in there barefoot on a wet floor, the toilet, sink, mattress or walls were not cleaned.

(*Id.*, ¶ 79).  Plaintiff acknowledges, that at 8:30 a.m. the next day, "I was taken out of the 'hell hole' and moved a couple of doors down.  Prior to this I was given my clothes back." (*Id.*, ¶ 80).

The Second Circuit has rejected "any bright-line durational requirement for a viable unsanitary-conditions claim[,]" and has instructed that a unconstitutional unsanitary conditions claim by a prisoner "depends on both the duration and severity of the exposure." *See Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (reversing district court's dismissal for failure to state an Eighth Amendment conditions of confinement claim where inmate plaintiff alleged that while kept naked in a strip cell, he was exposed, at a minimum, to seven days of human waste).  In *Darnell v. Pineiro*, the Second Circuit vacated the judgment of the district court which had "essentially ruled that no set of conditions, no matter how egregious, could state a due process violation if the conditions existed for no more than [10] to [24] hours" and held that such ruling "was error." *Darnell*, 849 F.3d 17, 37 (2d Cir. 2017).  Instead, the court held "conditions of confinement cases must be evaluated on a case-by-case basis according to severity and duration." *Id*.

Notwithstanding *Willey* and *Darnell*, "[n]umerous courts have held that unpleasant or unsanitary conditions only rise to the level of a Constitutional violation if they amount to an objectively and sufficiently serious denial of the minimal civilized measure of life's necessities." *Anduze v. City of New York*, No. 21-CV-519, 2022 WL

34

4586967, at *10 (S.D.N.Y. Aug. 8, 2022), *report and recommendation adopted*, 2022 WL 4547420 (S.D.N.Y. Sept. 29, 2022).  Furthermore, a plaintiff must proffer facts to show "an official's deliberate indifference to those conditions, or that . . . those conditions are punitive."  *Id.* (citing *Darnell*, 849 F.3d at 34 n.12).

Plaintiff fails to specify the duration of his confinement in the allegedly filthy mental health observation cell, but it was clearly less than 24 hours.  Nor does plaintiff allege that his exposure, for less than a day, to urine and feces in the cell, the floor of which was mopped as soon as he complained, presented any serious risk to his health or resulted in any adverse health consequences.  These deficiencies in his pleading preclude the court from determining whether plaintiff could satisfy the objective element of a deliberate indifference claim.  *See, e.g., Figueroa v. Cty. of Rockland*, No. 16-CV-6519, 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing conditions of confinement claim alleging lack of ventilation, insect infestation, and feces/bodily fluids on the walls because plaintiff did not provide details as to duration of conditions); *Grant-Cobham v. Martinez*, No. 20-CV-1947, 2020 WL 2097807, at * 3 (E.D.N.Y. May 1, 2020) (dismissing claim alleging dirty conditions at Rikers, including that other inmates threw feces at or near plaintiff because plaintiff failed to provide information about duration of condition and whether fecal matter built up to such an extent that plaintiff's health was placed at risk); *Jackson v. Sullivan Cnty.*, 16-CV-3673, 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) (dismissing conditions of confinement claim in absence of allegations regarding severity and duration); *Hamilton v. Westchester Cnty.*, No. 18-CV-8361, 2020 WL 917214, at *7 (S.D.N.Y. Feb. 25,

2020) ("Without any additional information as to the duration of the conditions Plaintiff alleges, the Court cannot determine that they pose an objectively unreasonable risk to Plaintiff's health."), *aff'd in part, vacated in part and remanded on other grounds*, 3 F.4th 86 (2d Cir. 2021).

Based on what plaintiff has alleged, he has not satisfied the objective element of a due process claim relating to the conditions of confinement during his brief stay in the mental health observation cell. *See, e.g., Howard v. Brown*, No. 15 CIV. 9930, 2018 WL 3611986, at *5 (S.D.N.Y. July 26, 2018) (courts in this circuit have regularly held that brief exposure to human waste or sewage does not rise to the level of a constitutional violation); *Myers v. City of New York*, No. 11 Civ. 8525, 2012 WL 3776707, at *6-7, (S.D.N.Y. Aug. 29, 2012) (holding that being held for "approximately 16 hours" in a cell without air conditioning where "[t]he only place to sit . . . was on 'a urine and filth laden floor'" did "not rise to the level of a constitutional violation"), *aff'd*, 529 F. App'x 105 (2d Cir. 2013); *Ortiz v. Dep't of Correction of City of New York*, No. 08 CIV. 2195, 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011) (holding that three exposures to waste for a total of "probably less than 24 hours" was "simply too limited to withstand a motion to dismiss"), *report and recommendation adopted*, 2011 WL 2638140 (S.D.N.Y. July 5, 2011).

The court in *Howard*, applying the required case-by-case analysis, distinguished the Second Circuit cases involving substantially more egregious conditions of confinement:

> Here, Howard has not plausibly alleged sufficiently serious confinement conditions.  Howard alleges that he was held for "several hours" in a cell littered

36

with "food . . ., papers, urine, and other un-sanitary things," with a nonworking
toilet filled with waste, and no running water or ventilation. . . . This case is
distinguishable from the "absolutely atrocious" conditions in *Darnell*, where the
plaintiffs endured, among other things, inadequate sanitation, overcrowding,
inedible food, extreme temperatures, and sleep deprivation for 10 to 24 hours,
849 F.3d at 20, 23-26, 37, and the "grotesque" conditions in *Willey*, which
included exposure to waste, poor ventilation, and being held naked for one to
four weeks, 801 F.3d at 55, 66. Rather, the Court follows numerous other
decisions holding that a brief exposure like the one alleged here does not rise to
the level of a constitutional violation.

*Howard v. Brown*, 2018 WL 3611986, at *5. *See also Singleton v. City of New York*,

No. 20-CV-8570, 2022 WL 4620174, at *5-6 (S.D.N.Y. Sept. 30, 2022) (plaintiff's

allegation that, when transported to court and between facilities, he must sit on a

transport bus that is "dirty and unsanitary with urine and defecation that's never

cleaned" "and inhale filth for hours . . . with no adequate ventilation" are closer to the

circumstances of cases like *Howard* and distinguishable from cases like *Darnell*).

Plaintiff's complaint acknowledges that, apparently to avoid the use of force to

overcome his resistence to being transferred out of the facility, the defendants, with

plaintiff's assent, moved plaintiff to a mental health observation cell. When plaintiff

complained about the condition of the cell in the mental health unit, Lt. Moore arranged

for the cell floor to be mopped. And plaintiff was moved to another cell the next

morning. Plaintiff's allegations do not state a plausible claim that the defendants acted

intentionally, recklessly, or with the intent to punish plaintiff, but, at most, were

negligent in not having the first cell cleaned more thoroughly or not moving him to

another cell sooner. Accordingly, plaintiff's complaint also fails to state the mens rea

element for a due process violation relating to the conditions of his confinement.

*Hamilton v. Westchester Cnty.*, at *7 (plaintiff's allegations that named defendants were "on notice" of, the poor conditions in his housing unit, but "took no action," or that they conducted daily rounds and were responsible for the conditions of confinement at the jail fail to demonstrate that any defendant acted in a manner that rose above the level of negligence, which is not adequate to satisfy the objective mens rea element for a due process claim); *Figueroa v. Cnty. of Rockland*, No. 16-CV-6519, 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (plaintiff merely alleges that defendants knew of the unsanitary conditions and "did not care" and "put [him] back in intake housing" after he was released from the hospital, which fails to demonstrate that defendants acted in a manner that was reckless or intentional, as opposed to merely negligent).

### 4.    Other Allegations re:  Conditions of Confinement

As noted, plaintiff makes other allegations regarding general conditions of confinement violating the rights other inmates.  (Compl. Supp., ¶¶ 81-84).  However, there are no other plaintiffs in this action, and plaintiff, because he is not a lawyer, could not represent the interests of others inmates, in this action or otherwise.  *See, e.g., Machadio v. Apfel*, 276 F.3d 103, 106 (2d Cir. 2002) ("an individual who is not licensed as an attorney 'may not appear on another person's behalf in the other's cause'") (citing *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998)).

To the extent plaintiff suggests that some of these general conditions of confinement affected him, he has not identified any specific instances or identified any particular defendants who were personally involved.  Nor has plaintiff stated if or how his constitutional rights were violated by the conditions of confinement he describes.

Based on the standards of pleading required by Fed. R. Civ. P. 8, discussed below, plaintiff's allegations about general conditions of confinement in Onondaga County Justice Center have not provided the defendants with adequate notice of the nature or basis of any plausible claims that plaintiff could assert against them.

## X.    Claims Against Municipal Entities

It is not clear from the complaint which municipal defendants plaintiff has tried to sue. To the extent he has named, as defendants, municipal sub-entities such as the Onondaga County Attorney's Office, the District Attorney's Office, the Onondaga County Justice Center, the City of Syracuse City Attorney, or the Syracuse Police Department, they are not separate legal entities that are subject to suit. *See, e.g., Harrison v. Inc. Vill. of Freeport*, 498 F. Supp. 3d 378, 399-400 (E.D.N.Y. 2020) ("Under New York law, "departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued.") (collecting cases).

To the extent plaintiff intended to sue the municipalities, Onondaga County and the City of Syracuse, his claim would not survive initial review. In order to state a claim against a municipality or municipal agency, plaintiff must present evidence that the alleged deprivation of his constitutional rights was caused by an official custom, policy or practice. *Monell v. Dep't of Social Services*, 436 U.S. 658, 691-94 (1978). To satisfy this requirement, a plaintiff may allege the existence of:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage

39

of which a supervising policy-maker must have been aware; or (4) a failure by policy makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Harrison v. Inc. Vill. of Freeport*, 498 F. Supp. 3d at 398 (collecting cases).  A single incident of unconstitutional activity by a municipal employee is generally insufficient to infer a custom, policy or practice as required by *Monell* to impose municipal liability. *Id.; Griffith v. Sadri*, No. CV-07-4824, 2009 WL 2524961, at *8 (E.D.N.Y. Aug. 14, 2009) (collecting cases).  Plaintiff's complaint does not make the type of *Monell* allegations sufficient to state a plausible claim of municipal liability on the part of Onondaga County or the City of Syracuse.  See, e.g., *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 705 (S.D.N.Y.1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation.") (collecting cases).[26]

## XI.  **Other Referenced Claims**

Plaintiff's complaint references, in vague and/or conclusory fashion, a laundry list of other possible grounds for claims against the named defendants.  ("Causes of Action," Dkt. No. 1 at 6; Compl. Supp., ¶ 91).  The court has identified and addressed any possible civil rights or other federal claims remotely suggested by the factual allegations in the complaint.  While the Second Circuit requires that pro se pleadings be liberally construed, "the basic requirements of Rule 8 apply to self-represented and

---

[26] Plaintiff arguably makes allegations suggesting a policy or practice when he addresses the general conditions of confinement in the Onondaga County Justice Center involving restrictive confinement and visitation practices.  (Compl. Supp., ¶¶ 81-83).  As noted above, however, plaintiff fails to allege how these allege practices affected him or violated any of his constitutional rights.

40

counseled plaintiffs alike." *Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004).

Under Rule 8, a pleading must contain "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To satisfy this

standard, the complaint must at a minimum "disclose sufficient information to permit

the defendant to have a fair understanding of what the plaintiff is complaining about

and to know whether there is a legal basis for recovery." *Harnage v. Lightner*, 916

F.3d 138, 141 (2d Cir. 2019) (quoting *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir.

2000)).  The vague "Causes of Action" section in the form complaint and conclusory

paragraph 91 towards the end of the complaint supplement do not give the defendants a

fair understanding of any basis for other possible civil rights claims that this court did

not address above.

　　　　To the extent plaintiff references possible claims under state law, the court notes

that there is no basis for diversity jurisdiction because all of the parties would appear to

be citizens of New York.  This court has found that plaintiff has not identified any

plausible federal claim against any of the named defendants and would recommend

against the exercise of supplemental jurisdiction over the state law claims summarily

referenced at the end of plaintiff's complaint.  See, e.g., *Lawtone-Bowles v. City of New

York, Dep't of Sanitation*, 22 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) ("When all federal

claims are eliminated before trial, the balance of factors to be considered–including

judicial economy, convenience, fairness, and comity–typically points towards declining

to exercise supplemental jurisdiction over any remaining state-law claims.") (citing,

inter alia, *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122-24 (2d Cir. 2006)).

## XII.   **Opportunity to Amend**

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). As stated below, this court recommends that certain of plaintiff's stated or imputed claims be dismissed with prejudice because efforts to amend these claims would be futile. The court recommends that the remaining stated or imputed claims be dismissed without prejudice; but that, for claims currently barred by *Heck v. Humprhey* , plaintiff not be permitted to amend those claims unless and until his conviction is invalidated on appeal or otherwise.

PLAINTIFF IS ADVISED THAT HE SHOULD NOT ATTEMPT TO AMEND HIS COMPLAINT UNTIL SENIOR U.S. DISTRICT COURT JUDGE McAVOY RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S ORIGINAL CLAIMS. ANY PROPOSED AMENDED COMPLAINT FILED BEFORE JUDGE McAVOY'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, the plaintiff may file objections to this court's orders and recommendations.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 2) is **GRANTED** for purposes of filing and any appeal, unless the trial court certifies in writing that the appeal is not taken in good faith (see 28 U.S.C. § 1915(a)(3)), and it is

**ORDERED** that the plaintiff complete and submit to the court an executed Inmate Authorization Form, a blank copy of which the Clerk will mail to plaintiff, and a certified copy of his DOCCS inmate account, and it is

**RECOMMENDED**, that the following claims be **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND**:  (1) all claims against defendant Judges, Hon. Stephen J. Dougherty and Hon. Rory A. McMahon; (2) all claims against defendant Assistant District Attorneys Jarrett Woodfork, Michael Whalen, Anthony Mangovski, and Alphonse Williams; (3) all claims based on testimony before a grand jury or at trial of defendants Officer Dallas Pelz, Arthur Stripling, Tonya Burton, Tammy McNeilly, and Sasha Thornton; (4) any claims based on violations of state or federal criminal statutes; and (5) all claims against sub-entities or departments of the City of Syracuse or County of Onondaga, New York, and it is

**RECOMMENDED,** that, to the extent the court has identified claims currently barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), those claims be **DISMISSED WITHOUT PREJUDICE, BUT WITHOUT LEAVE TO AMEND** unless and until plaintiff's criminal conviction is reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, and it is

**RECOMMENDED,** that plaintiff's remaining claims against all remaining defendants be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND,** and it is

**RECOMMENDED**, that if the District Judge adopts these recommendations,

plaintiff be given forty-five (45) days to amend his complaint to the extent authorized, and that plaintiff be advised that any amended pleading must be a **COMPLETE PLEADING, WHICH WILL SUPERCEDE THE ORIGINAL**, and that plaintiff must include all the remaining facts and causes of action in the amended complaint.  **No facts or claims from the original complaint may be incorporated by reference**, and it is

RECOMMENDED, that if the district court adopts these recommendations, and plaintiff files a proposed amended complaint, the proposed amended complaint be returned to me for review; and it is

RECOMMENDED, that if the district court adopts these recommendations, the Clerk of the Court shall be authorized, without further order, to dismiss the entire complaint without leave to amend if plaintiff does not file an amended complaint within the forty five (45) day deadline, or request a reasonable extension of time to do so, and it is

ORDERED, that while plaintiff may file objections to this Order and Report-Recommendation, he must wait for the District Court to rule on the above orders and recommendations before plaintiff submits any proposed amended pleading, and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on the plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO**

44

**THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

**REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary*

*of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72.


Dated:   February 21, 2023

Andrew T. Baxter
U.S. Magistrate Judge

45